IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN MARTIN,<br><br>        Plaintiff,<br><br>   v.<br><br>CITY OF RICHMOND,<br><br>        Defendant.<br>_____/ | No. C 06-06146 CRB<br><br>**ORDER RE: DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Plaintiff Kevin Martin is a police officer employed by Defendant City of Richmond. On behalf of himself and other similarly situated officers, Plaintiff brought this lawsuit, claiming that Defendant has failed to compensate him for the performance of certain work-related tasks, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207. These uncompensated tasks include, among other things, the donning and doffing of his police uniform, as well as required safety and protective gear. Defendant now moves for partial summary judgment on the theory that its officers are not entitled to compensation for these tasks because the Richmond Police Department allows them to don and doff their uniforms and safety equipment at home. For the reasons set forth below, Defendant's motion is GRANTED in part and DENIED in part.

//

//

**BACKGROUND**

The Richmond Police Department requires its on-duty officers to wear uniforms so that they are "readily identifiable to the public." Ritter Decl., Exs. A & B, § 1046.1 (hereinafter "RPD Policy Manual"). The purpose of the uniform is to allow the public to identify the officer both as "the law enforcement authority in society" and also as "a source of assistance in an emergency, crisis or other time of need." Id. § 1046.2. For these same reasons, the City of Richmond also has a policy prohibiting officers from wearing uniforms when they are off-duty. The Department's policy states:

> Uniforms are only to be worn while on duty, while in transit to or from work, for court, or at other official Department functions or events.
>
> If the uniform is worn while in transit except to and from work, other than in an abated auto, an outer garment shall be worn over the uniform shirt so as not to bring attention to the employee while he/she is off duty.

Id. §§ 1046.1(g), (h). It is due to concern that off-duty officers might become entangled in law-enforcement tasks that the City of Richmond requires them to conceal their identity as officers when they are not on the job. The Department's policy thus recognizes one of the unique aspects of a police officer's garb: that the uniform itself enables an officer to do his or her job.[1]

An officer's uniform includes clothing, such as department-approved pants and shirts, and footwear, such as polished boots. Id. § 1046.3. It also includes "duty equipment," such as a badge, handcuffs, a flashlight, a "walkie talkie" and case, a holster and firearm, a baton, and a bullet-proof vest. See generally id. § 702.2. The particular gear that an officer must wear often depends upon his or her assignment. For instance, administrative assignments require little protective gear and equipment, whereas officers on other assignments, such as "K-9" or "Bicycle Patrol," must wear additional or special gear. Id. § 1046.34.

---

[1] The beneficial effect of the police uniform is not disputed. The Department's own policy implicitly recognizes the uniform's practical effect. Further, personnel in the police department also testified about its importance. As Deputy Chief Lori Ritter agreed, the uniform and protective gear constitute "part of a package, all of which is important to the safety and to the function of a peace officer in the field," allowing the officer "to perform his or her job." Ramsey Decl., Ex. A, at 28-29 (hereinafter "Ritter Dep."); see also Ramsey Decl., Ex. D, at 13.

2

All officers must be fully equipped and in uniform at the start of their shifts; otherwise, they are deemed tardy and are subject to discipline. Id. § 342.31 ("Members and employees shall report to duty at the time and place specified, properly uniformed and equipped."). However, the City of Richmond does not formally demand that officers don and doff their uniforms and gear at the police station. On the contrary, the Department permits officers to dress at home. See Ritter Decl. ¶ 8 ("It is the Department's longstanding policy that officers have the option of donning and doffing uniforms and required gear at home. It is up to the individual officer, based on his or her personal preference, whether to don and doff their uniforms and required gear at the station or some other location of [his or her] choosing."). The Department's written dress policy confirms that officers have the option of dressing at home. See RPD Policy Manual § 1046.1(g) ("Uniforms are only to be worn while on duty, *while in transit to or from work*, for court, or at other official Department functions or events." (emphasis added)).

There is limited evidence about the extent to which Plaintiff and his fellow officers actually exercise the option of donning and doffing their uniforms and gear at home. It is undisputed that a large majority of the officers get dressed and put on their protective gear at the police station, where an individual locker is available for them to store their uniforms, gear, and personal items. It is also undisputed that a significant number of officers get partially dressed at home and then don and doff certain parts of their uniforms and protective gear at the station. According to a Deputy Chief in the Department, "[f]or those officers who get partially dressed at home, the common practice is to leave their uniform shirt[s], vest[s] and gun/utility belt[s] in their lockers at the end of the day, wearing only their uniform pant[s] and shoes home."   See Ritter Decl. ¶ 11. Finally, a small number of officers do all of their donning and doffing at home. In a force that includes 170 sworn officers, however, it is unclear precisely how many officers fall into each of these three different categories.[2]

---

[2] Defendant relies on the declaration of Lori Ritter, a deputy chief of the Richmond Police Department, who estimates that "approximately twenty-five (25) percent of officers get either fully or partially dressed at home." Ritter Decl. ¶ 11. She further states that "[d]uring [her] tenure with the Department, it has been [her] personal practice to get fully dressed and undressed

3

Officers give different reasons for choosing to dress, either entirely or partially, at the station. For instance, many officers indicated that they find it preferable to don and doff at work because they consider their gear "uncomfortable to wear" during a commute. Others stated that they get dressed at work so that they do not "leave home without an item." Many officers stated that they prefer to dress at work because there are "distractions" at home that might keep them from donning their equipment properly or safely. Others stated that they fear that their gear could be "lost or stolen" at home. Some officers expressed concern that their heavy protective gear, which weighs as much as 30 pounds, would cause them injury if they donned all of their materials home. Still others expressed fear that getting dressed at home would allow them to be identified in their communities as police officers, subjecting them and their families to possible violence, retaliation, or hostility. See generally Ramsey Decl. Ex. F (attaching declarations from 41 officers giving their reasons for dressing at the police station, all of which appear to have been taken from a checklist of justifications); see also Ramsey Decl., Ex. C, at 15 (Deposition of Officer William Cantrell) ("I personally believe that it's an officer safety thing to come in dressed. . . . I've arrested a lot of people

---

at home before commuting to and from work." Id. Meanwhile, Plaintiff relies on an informal survey of the consenting officers who have joined as Plaintiffs in this action. See King Decl. ¶ 3; 29 U.S.C. § 216(b). According to this survey, which covered 79 of the 135 consenting officers and was conducted by Plaintiff's counsel, roughly 90 percent of officers indicated that they did all of their donning and doffing at the station; slightly less than 9 percent indicated that they did their donning and doffing partially at home and partially at the station; and slightly more than 1 percent (meaning only one respondent in the "survey") indicated that he did all of his donning and doffing at home.

Defendant objects to the survey of Plaintiff's counsel as hearsay, which clearly it is. (The proper method for presenting this evidence would have been to submit the survey directly to the Court, with the officers' direct responses to the questions asked, or better yet, in the form of declarations from the officers themselves.) The Court is therefore constrained not to consider the minutiae of the survey as evidence of the officers' practices. Further, even if it were permissible for the Court to consider the informal survey, additional circumspection would be warranted due to other potential problems with the survey, such as a possible sample bias among the "consenters," and the fact that it does not even include all members of that unique group.

Nonetheless, it is worth noting that, in all material aspects, the survey actually confirms the evidence presented by Defendant. Thus, on the record now before the Court, it is essentially undisputed that the vast majority of officers does all of the dressing and undressing at the station; that a sizeable minority of the officers performs these tasks partially at home and partially at the station; and that a few outliers do their donning and doffing entirely at home.

since I've been here, and I have been a target.  Therefore, wearing a uniform, partially dressed, you know, in your own personal car, I believe that you become a bigger target.").

Now pending before the Court is Defendant's motion for partial summary judgment. The motion raises the issue of whether the donning and doffing of the officers' uniforms and safety gear constitute compensable "work" under the FLSA.  Defendant claims that the FLSA does not require compensation for such tasks, and that it is entitled to judgment as a matter of law, because the officers "are not required to don and doff on the employer's premises."  Motion at 1.  Plaintiff responds that the FLSA imposes no such bright-line, at-home-versus-at-work rule and that, even if the Court were to accept Defendant's view of the law, the circumstances of the officers' work effectively prevents them from donning and doffing at home anyway.

**STANDARD OF REVIEW**

"Whether an activity is excluded from hours worked under the FLSA . . . is a mixed question of law and fact. The nature of the employees' duties is a question of fact, and the application of the FLSA to those duties is a question of law." Ballaris v. Wacker Siltronic Corp., 370 F.3d 901 (9th Cir. 2004) (citations omitted).

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the non-moving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

A principal purpose of the summary judgment procedure "is to isolate and dispose of factually unsupported claims." See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

A party moving for summary judgment that does not have the ultimate burden of persuasion at trial has the initial burden of either producing evidence that negates an essential element of the non-moving party's claims or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). Where the party moving for summary judgment would bear the burden of proof at trial, it bears the initial burden of producing evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000).

If the moving party does not satisfy its initial burden, the non-moving party has no obligation to produce anything and summary judgment must be denied. If, however, the moving party satisfies its initial burden of production, then the non-moving party may not rest upon mere allegations, or denials of the adverse party's evidence, but instead must produce admissible evidence to show there exists a genuine issue of material fact. Nissan Fire & Marine, 210 F.3d at 1102.

## DISCUSSION

The FLSA requires employers to pay employees for the all of the work they perform. 29 U.S.C. §§ 206, 207. As the Ninth Circuit has stated, it is "axiomatic" that the FLSA requires employers to pay compensation for "all hours worked." Alvarez v. IBP, Inc., 339 F.3d 894, 902 (9th Cir. 2003), aff'd, 546 U.S. 21 (2005). What constitutes work is the thorny issue raised by a case such as this one.

Since the passage of the FLSA in 1938, the Supreme Court has defined "work" in broad terms. In Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123, 321 U.S. 590 (1944), the Court defined "work" to include all "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." Id. at 598. The Court thus held that miners were entitled to compensation for time spent before and after each shift making the "compulsory" and "hazardous" trip to their employer's "underground . . . iron ore mines." Id. at 599-600.

Similarly, in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946), the Supreme Court held that "the statutory workweek includes all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." Id. at 688-89. The Court thus ruled that employees at a "pottery plant" were entitled to compensation for time it took them "to punch in, walk to their work benches and perform preliminary duties during the 14-minute periods preceding productive work." Id. at 690. In Armour & Co. v. Wantock, 323 U.S. 126 (1944), the Court further stated that "work" need not entail actual exertion on the part of an employee, noting that an employer "may hire a man to do nothing, or to do nothing but wait for something to happen." Id. at 133. The Court thus held that a soap manufacturer was required to compensate its "private fire-fighting force," even though it was "not engaged in any specific work," when firemen were "required to stay in the fire hall, to respond to any alarms, to make any temporary repairs of fire apparatus, and take care of the sprinkler system if defective or set off by mischance." Id. at 127-28, 134.

In 1947, Congress somewhat narrowed the Supreme Court's expansive application of the FLSA by passing the Portal-to-Portal Act. In the legislature's view, the Supreme Court's decisions had "interpreted [the statute] in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation." Portal-to-Portal Act of 1947, Pub. L. No. 80-49, § 1, 61 Stat. 84, 84. Congress therefore limited the scope of the FLSA's compensation requirements. The relevant provision provides:

> [N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities . . .
>
> > (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
> >
> > (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

7

Portal-to-Portal Act § 4(a) (codified as amended at 29 U.S.C. § 254(a)).  Thus, under the FLSA, as amended by Congress in 1947, employees are entitled to compensation only for the performance of the "principal activity or activities" required by their jobs, and not for tasks that are "preliminary" or "postliminary" to them.

Since the passage of the Portal-to-Portal Act, it has been the task of the courts to determine whether tasks incident to employment are compensable as "principal activities," or instead, whether they are non-compensable as mere "preliminary" or "postliminary" activities.  The Supreme Court first addressed that issue in two companion cases in 1956, one of which involved the donning and doffing of protective gear.  In Steiner v. Mitchell, 350 U.S. 247 (1956), the Court held that workers at a battery plant were entitled to compensation for "the time incident to changing clothes at the beginning of the shift and showering at the end."  Id. at 256.  The Court reasoned that the battery plant employees were entitled to compensation for those activities because they were "an integral and indispensable part of the principal activity of the employment."  Id. at 256.

The Steiner Court stressed that its decision rested on the unique context of the battery plant.  The Court concluded that the donning and doffing of protective materials were essential to the work performed there because workers were required to "make extensive use of dangerously caustic and toxic materials, and [were] compelled by [the] circumstances, including vital considerations of health and hygiene, to change clothes and to shower in facilities which state law requires their employer to provide."  Id. at 248.  The Court emphasized that it was not presented with "the question of [whether] changing clothes and showering under normal conditions" would also require compensation, noting that the parties had conceded that "these activities ordinarily constitute 'preliminary' or 'postliminary' activities excluded from compensable work time as contemplated in the Act."  Id. at 249.

Following the Supreme Court's decision in Steiner, lower courts have approached similar FLSA cases by trying to determine whether the uncompensated activities in question are "integral and indispensable" to the employees' "principal activities."  See, e.g., Alvarez v. IBP, Inc., 339 F.3d at 902-04 (citing Steiner, 350 U.S. at 356); Barrentine v.

8

Arkansas-Best Freight Sys., Inc., 750 F.2d 47, 50 (8th Cir. 1984) (same); Dunlop v. City Elec., Inc., 527 F.2d 394, 400-01 (5th Cir. 1976) (same).  Further, the Department of Labor has issued regulations to provide guidance to employers about the types of activities that require compensation under the FLSA.  To that end, it issued a regulation describing "principal" activities as follows:

> Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance.  If an employee in a chemical plant, for example, cannot perform his principal activities without putting on certain clothes, changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity.  On the other hand, if changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered as a "preliminary" or "postliminary" activity rather than a principal part of the activity.

29 C.F.R. § 790.8(c) (footnotes omitted).  The regulation notes that a situation requiring compensation "may exist where the changing of clothes on the employer's premises is required by law, by rules of the employer, or by the nature of the work." Id. § 790.8(c) n.65. The regulations also indicate that basic activities such as "checking in and out and waiting in line to do so, *changing clothes*, washing up or showering, and waiting in line to receive pay checks" are not "normally" compensable.  29 C.F.R. § 209.7(g).

Further, in an advisory memorandum regarding the Supreme Court's recent decision in IBP v. Alvarez, 546 U.S. 21 (2005), the Department of Labor recently reiterated its view that the FLSA does not require compensation where employees don and doff protective gear at home.  The memo states:

> Therefore, the time, no matter how minimal, that an employee is required to spend putting on and taking off gear on the employer's premises is compensable "work" under the FLSA.
>
> . . . .
>
> However, donning and doffing of required gear is within the continuous workday only when the employer or the nature fo the job mandates that it take place on the employer's premises.  It is our longstanding position that if employees have the option and the ability to change into the required gear at home, changing into that gear is not a principal activity, even when it takes place at the [place of employment].

//

//

9

1  Request for Judicial Notice, Ex. B, at 1-3 (hereinafter "DOL Memo").  Although the
2  Department of Labor's view of the statute is not controlling, this "administrative
3  interpretation of the statute is at the least entitled to great weight as part of 'a body of
4  experience and informed judgment.'"  Wirtz v. Western Compress Co., 330 F.2d 19 (9th Cir.
5  1964) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

6  Under this legal framework, then, the crucial question is whether the donning and
7  doffing of uniforms and other "duty equipment" is an "integral and indispensable" part of
8  Plaintiff's "principal activities" as a policeman employed by the City of Richmond.  Plaintiff
9  initially argues that a police uniform, by its very nature, is integral and indispensable to his
10 work in law enforcement.  After all, as the Deputy Chief of the Department herself observes,
11 the required uniform and safety gear are "part of the package necessary to make [officers]
12 safe and functional on the street."  Ritter Dep. at 29.  Indeed, she notes that it is partly the
13 effect of the uniform itself that "makes the community feel better."  Id. at 28.  The
14 Department's formal policies reinforce this idea, noting that the purpose of police uniforms is
15 to allow the wearers "to be identified as the law enforcement authority in society" and "as a
16 source of assistance in an emergency, crisis or other time of need."  RPD Policy Manual §
17 1046.2.  It is precisely because an officer's uniform marks him as a source of assistance that
18 the Department prohibits officers from wearing their garb when they are not on duty and
19 available to provide such help.  See id. § 1046.2(g).  Plaintiff thus contends that the inherent
20 effect of a police officer's uniform and safety gear makes these items "integral and
21 indispensable" to the officer's "principle activity" of law enforcement.

22 Plaintiff's argument is not without force, but in the Court's view, it proves too much.
23 The same logic applies to nearly *any* uniform.  A waitress's apron or a stewardess's uniform
24 marks its wearer as an employee and thereby allows restaurant patrons or flight passengers to
25 seek service directly from the worker.  The uniform of a postal service employee allows often
26 provides greater access to buildings, making the work of delivering mail easier and more
27 efficient.  And at least most of the time, a black robe establishes a judge's authority in a
28 //

10

courtroom. Yet there is no law to support the proposition that an employee is entitled to compensation by virtue of the donning and doffing of a distinctive costume.

To the contrary, no matter how helpful or socially significant a particular outfit might be to the performance of an employee's duties, the law rejects the idea that donning and doffing of mere clothes is enough to establish an employee's right to compensation under the FLSA. See, e.g., Steiner, 350 U.S. at 248 (noting the parties' apparent concession that "changing of clothes and showering under normal conditions . . . ordinarily constitute 'preliminary' or 'postliminary' activities excluded from compensable work time"); 29 C.F.R. § 790.8(c) ("[I]f changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered as a 'preliminary' or 'postliminary' activity rather than a principal part of the activity."). Cf. 29 U.S.C. § 203(*o*) (stating that "any time spent in changing clothes or washing at the beginning or end of each workday" "shall be excluded" where, as here, such time has been excluded "by custom or practice under a bona fide collective-bargaining agreement").

A police officer's uniform, in and of itself, does not assist the officer in performing his duties. Consider the various articles of an officer's uniform: the "long- or short-sleeved shirt," the "white, navy blue or black crew-neck T-shirt or mock turtleneck," the "all-black polished shoes," and the various insignia and patches that indicate an officer's rank. RPD Policy Manual §§ 1046.2, 1046.4. None of these items actually are integral or indispensable to the officer in carrying out his tasks. Aside from the authority they connote, these items of clothing do not help catch suspects, and they do not protect officers from violence. Something more than the salutory effect of a uniform on those who recognize its cultural significance is necessary to make its donning and doffing "integral and indispensable" to an officer's "principal activities" of law enforcement. If the law were otherwise, *all* uniforms would entitle their wearers to compensation under the FLSA.

A police officer's "duty equipment," however, is a different issue. These devices — badges, handcuffs, batons, fierarms, holsters, whistles, gas masks, safety vests, flashlights, helmets, and body armor, see RPD Policy Manual §§ 702.2, 1024.1 — actually allow officers

11

to carry out their law enforcement tasks.  Restraining devices, weapons, and protective gear enable officers to enforce the law against those who break it; indeed, it would be unthinkable to send officers into the streets to fight crime without them.  In this sense, the "duty equipment" of the Richmond Police Department is legally akin to the "metal aprons, leggings, vests, sleeves, and gloves, and plexiglass arm guards" of slaughterhouse workers, Alvarez, 339 F.3d at 898 & n.2; the special "work clothes" of battery plant employees, Steiner, 350 U.S. at 249-50; or the protective clothing of "an employee in a chemical plant," 29 C.F.R. § 790.8(c).  Without such specialized gear and equipment, the officers cannot do their jobs safely.  See RPD Policy Manual §§ 1024.1, 1024.2 (stating that "body armor vests are issued to all sworn personnel because they have been effective in preventing deaths and serious injuries in police shootings").

Further, "it is beyond cavil that the donning, doffing . . . and retrieving of protective gear is, at both broad and basic levels, done for the benefit of [the Richmond Police Department]."  Alvarez, 339 F.3d at 894.  Police officers do not wear protective gear for personal comfort or convenience; they bear the 30-pound load because of the policy of their employer and the demands of their working environment.  See RPD Policy Manual § 702.2 ("All employees shall carry equipment as directed by the Chief of Police."); id. § 1046.8 ("Richmond Police employees may not use or carry any safety item, tool or other piece of equipment unless specifically authorized in the Uniform and Equipment Specifications or by the Chief of Police or designee.").

The only question that remains is whether, as Defendant contends, compensation need not be paid to the officers for donning and doffing their gear because they have the option of performing these tasks at home.  Cf. 29 C.F.R. § 790.8(c) n.65.  The Court accepts the proposition, espoused by the Department of Labor, that the donning and doffing of protective gear at home typically renders that activity non-compensable under the FLSA.  Even accepting that proposition, however, it is clear in this case whether Richmond police officers actually have a meaningful opportunity to don their protective gear at home, or instead, whether that option is illusory.

Although it is undisputed that Defendant formally permits officers to change at home, see RPD Policy Manual § 1046.1(g), Plaintiff and his fellow officers contend that the circumstances of their employment do not actually allow them to do so. Their concerns extend beyond mere "convenience." See 29 C.F.R. § 790.8(c) ("[I]f changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered as a 'preliminary' or 'postliminary' activity rather than a principal part of the activity."). First, they contend that donning and doffing their heavy and cumbersome gear at home increases their risk of physical injury. See, e.g., Abetkov Decl. ¶ 9 ("The protective/safety gear and equipment, particularly my ballistic vest and utility belt, are uncomfortable to wear and I believe that wearing them to and from work will increase the chance of a debilitating [or] career ending or painful back or knee injury."). They also suggest that the donning and doffing of protective gear at home jeopardizes the safety of those around them. Id. ¶ 6 ("Conducting the requisit operational checks on my firearm(s) and other gear at home creates an unnecessary risk of injury to others."). Finally, the officers contend that getting dressed at home will subject them, and perhaps their families, to retaliatory acts by offenders whom they have encountered. See, e.g., Ramsey Decl., Ex. E, at 7 (Deposition of Officer Kendall Baggett) ("Not everyone in my neighborhood knows what I do for a living, and I don't want everyone to know what I do for a living and know where I live. . . . Some people are bad people.").

Defendant dismisses these concerns as mere "speculation," arguing that such "conjecture" is "insufficient to raise an issue of material fact on summary judgment." Reply at 11 (citing Witherow v. Paff, 562 F.3d 264, 266 (9th Cir. 1995)). But the concerns of the Richmond officers are more than mere conjecture. To the contrary, the officers have set forth plausible reasons why donning and doffing their gear at home may jeopardize their health and safety. Indeed, the California legislature has implicitly recognized the legitimacy of these concerns. Cf. Cal. Labor Code § 3213.2 (providing that the "lower back impairment" of a "peace officer" is "presumed to arise out of and in the course of the employment," in part because of the heavy "duty belt" the officer must wear); Cal. Govt.

Code § 6254(u) (restricting the dissemination of information to the public about the "home address and telephone number of peace officers"). Further, some of the officers in this case have provided testimony that they personally have become targets for reprisal or revenge. Ramsey Decl., Ex. C, at 15 (Deposition of Officer William Cantrell) ("I've arrested a lot of people since I've been here, and I have been a target.").

It is not enough that, as a matter of formal policy, the City of Richmond gives its officers the "option" of donning and doffing their gear at home. Even the authorities cited by Defendant make it clear that the question is not simply whether an employer formally requires employees to get dressed and undressed at work. To the contrary, under federal regulations, the question is whether they are in effect constrained to do their donning and doffing at work — in the Department of Labor's words, "where the changing of clothes on the employer's premises is required by law, by rules of the employer, *or by the nature of the work*." 29 C.F.R. § 790.8(c) n.65 (emphasis added). Accord DOL Memo at 3 ("It is our longstanding position that if employees have the option *and the ability* to change into the required gear at home, changing into that gear is not a principal activity . . . ." (emphasis added)). It is difficult to imagine that the Supreme Court's decision in Steiner or the Ninth Circuit's ruling in Alvarez would have come out differently if the battery plant or the meat processing plant had, as a formal matter, permitted employees to don and doff their unique protective equipment at home. Further, the Court is unpersuaded that summary judgment is appropriate simply because an officer or two may actually don and doff his gear at home. See Steiner, 350 U.S. at 351 n.1 (holding that the FLSA required compensation for workers at a battery plant, notwithstanding the "exception [of] one injured employee who, because of the danger of infection to his wounded foot in a common shower, bathed at his home which [was] about five blocks from the plant").

As the party moving for summary judgment, the City of Richmond has the burden of demonstrating that "the record taken as a whole could not lead a rational trier of fact to find for the [police officers]." Matsushita Electric Industries, 475 U.S. at 587. Here, even assuming that the City had carried its "initial burden of production" to set forth "evidence

14

negating an essential element of the [officer's] claim," <u>Nissan Fire & Marine</u>, 210 F.3d at 1102, Plaintiff and his fellow officers have responded with evidence sufficient to create a "genuine issue of material fact" as to whether the "nature of the work" in effect prevents them from donning and doffing their protective gear at home, <u>Anderson</u>, 477 U.S. at 248-49. The Court holds that Defendant is not entitled to summary judgment simply because Richmond police officers have the formal option of donning and doffing their protective gear at home, given that the officers have responded with evidence from which a reasonable jury could infer that the option is in fact illusory. Thus, even accepting the view that employees are not entitled to compensation for donning and doffing protective gear when they have the ability to do so at home, Defendant has not shown that it is entitled to summary judgment.

## CONCLUSION

The Court concludes that Plaintiff and his fellow consenting officers are not entitled to compensation for the time they spend donning and doffing their police uniforms. Insofar as their claims purport to recoup compensation for such activity, Defendant's motion for summary judgment is GRANTED in part. As for the donning and doffing of required "duty equipment," the Court concludes that summary judgment is unwarranted, notwithstanding Defendant's formal policy of permitting officers to put on and take off their protective gear at home. In the Court's view, a triable issue of fact exists about whether the "nature of [a peace officer's] work" actually requires them to don and doff their gear at the station. 29 C.F.R. § 790.8(c) n.65. For this reason, Defendant's motion for summary judgment in DENIED in part.

The Court expresses no view about whether the option of donning and doffing at home, if actually available to the Richmond police force, would be sufficient to absolve Defendant of liability. Nor does the Court express any view about whether time spent maintaining equipment on behalf of the police force is compensable "work" under the

//
//
//

15

FLSA,[3] or whether officers spend sufficient time donning or doffing protective gear alone to require compensation for those work-related tasks.[4]

**IT IS SO ORDERED.**

Dated: August 10, 2007

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

---

[3] See, e.g., Mitchell v. King Packing Co., 350 U.S. 260, 263 (1956) (holding that the "knifesharpening activities" of workmen at a meat processing plant were compensable because they were "an integral part of and indispensable to the various butchering activities for which they were principally employed").

[4] See, e.g., Alvarez, 339 F.3d at 903 (affirming the district court's conclusion that "time spent donning and doffing non-unique protective gear such as hardhats and safety goggles is not compensable" because "[t]he time it takes to perform these tasks . . . is *de minimis* as a matter of law").